## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

A.D. and M.D., *individually and on behalf of*
D.A., a Minor,

                    *Plaintiffs,*

        v.

UPPER MERION AREA SCHOOL DISTRICT,

                    *Defendant.*

CIVIL ACTION
NO. 21-5468

**PAPPERT, J.**                              **October 28, 2022**

## MEMORANDUM

A.D. and M.D., individually and on behalf of their great-grandchild D.A., filed a

special education due process complaint against Upper Merion Area School District for

violations of the Individuals with Disabilities Education Act during the 2019–2020 and

2020–2021 school years. Specifically, they allege that the District failed to provide a

free appropriate public education ("FAPE") when it offered virtual instruction in March

to June of 2020 and several weeks of the Fall of 2020, and in-school instruction during

the remainder of the 2020–2021 school year. The Hearing Officer found that the

District offered D.A. a FAPE throughout the relevant time period. (Administrative

Decision at 3, ECF 1-2.) [1]

The parties filed cross-motions for judgment on the administrative record (ECF

13, 14), response briefs (ECF 16, 17), and replies (ECF 18, 19). After a careful review of

---

[1]    Originally, Plaintiffs claimed that the violations occurred throughout the entire 2019–2020
school year. The Hearing Officer found that the District did not violate the IDEA during that time
period. (Administrative Decision at 14.) At this point, Plaintiffs only challenge the decision on the
2019–2020 school year as it relates to March–June 2020, when the District was closed to in-person
learning during the COVID-19 pandemic. (Pls.' Mot. for J. on the Administrative R. at 1 n.1, ECF 14.)

the underlying record, the Hearing Officer's Final Decision and Order and the parties' briefing, the Court grants judgment in favor of Plaintiffs with respect to the first two weeks of the 2020–2021 school year and the period from November 17, 2020 until in-school instruction resumed in January of 2021. It grants judgment in favor of the District with respect to all other time periods at issue.

I

D.A., a nine-year-old student in the Upper Merion Area School District, was born with significant health problems and conditions affecting brain development. (Hrg. Tr. 392–94.) D.A.'s guardians are the child's great-grandparents, who have had full legal custody since D.A. was an infant. (SD-31, at 2.)[2] D.A. is eligible for special education and received early intervention services before entering kindergarten in the Fall of 2019. (Hrg. Tr. 115:13–15.) In preparation for the transition to kindergarten, District educators reviewed D.A.'s early intervention evaluation and observed D.A. in the early intervention classroom. (Hrg. Tr. 798:15–18; 830:19–22.) D.A.'s Individualized Education Program team met and developed a kindergarten IEP[3] in June of 2019. (Hrg. Tr. 294:9–12.)

A

Under the IEP, D.A. spent half of the school day in the regular kindergarten classroom, and the other half in the special education classroom. (Hrg. Tr. 372:7–11.) A one-to-one personal care assistant ("PCA") accompanied D.A. for the entire school

---

[2]     This Opinion will denote the District's exhibits as "SD-##" and the guardians' exhibits as "P-##."

[3]     The IEP is a comprehensive plan required under the IDEA that describes the impact of the student's disability on learning, the student's annual educational goals, and the supports and instruction methods that the school will implement. *See* 20 U.S.C. § 1415(d)(1)(A).

day.  (Hrg. Tr. 213:13–16.)  D.A. also received pull-out physical therapy, occupational therapy, and speech therapy.  (SD-9, at 33.)  The District implemented a Positive Behavioral Support Plan ("PBSP") for D.A. to reinforce appropriate behavior and increase motivation.  A key aspect of the PBSP was the token economy system:  D.A. received a small, tangible token (e.g., a mark on a star chart) after completing a certain number of learning tasks.  (Hrg. Tr. 300–01.)  After earning three tokens, D.A. was allowed a short break to play with preferred toys or watch a favorite video.  (*Id.*)  D.A.'s teachers reported that although the student had some difficulty focusing—particularly on tasks that were not preferred or had not yet been mastered—D.A. was easily redirected with a verbal reminder.  (Hrg. Tr. 300:5–15.)  D.A. made academic progress from September of 2019 to March of 2020.  (Hrg. Tr. 317:5–16.)

B

March to June of 2020

From mid-March 2020 through the end of the 2019–2020 school year, the District's schools—along with all public schools in the Commonwealth—were closed pursuant to Governor Wolf's COVID-19 orders.  (Hrg. Tr. 996–99.)  The District did not offer instruction to any students between March 16 and March 27.  (SD-16, at 1; Hrg. Tr. 638.)  Distance learning began for D.A. and other district students on March 30, 2020.  (SD-36, at 29.)  The first two weeks of distance learning—March 30 to April 3, and April 14 to April 17, with a one-week Spring break in the middle—were delivered by asynchronous[4] "maintenance instruction."  (SD-16 at 1; SD-36 at 29; Hrg. Tr.

---

[4]      Asynchronous instruction allows students to access and complete course materials at their own pace.  By contrast, synchronous instruction requires them to participate in online lessons in real time.

240:16–18, 242:14–16.)  During this period, the goals were to help students "pair" with the technology—meaning they would become accustomed to receiving instruction in an online format—and to mitigate learning loss caused by the closure.  (Hrg. Tr. 243.) Synchronous online instruction[5] over the Zoom platform began on April 20, 2020 and continued until the last day of school on May 28, 2020.  (SD-16, at 1; Hrg. Tr. 242:16–19.)

        There were immediate problems implementing D.A.'s virtual instruction.  (Hrg. Tr. 248–49.)  The student's attendance was "sporadic" due to a combination of technical and behavioral issues.  (Hrg. Tr. 143:12–17.)  Every student in the District received an iPad to enable them to access lessons.  D.A.'s great-grandparents struggled to master— and in some cases rejected—the technology needed to connect to the virtual environment.  (Hrg. Tr. 249:4–7.)  The District tried to help with this in many ways. D.A.'s teacher would call before a lesson began to provide tech support and help D.A.'s guardians log in.  (Hrg. Tr. 260:5–9, 318:5–9.)  Tech support was also available by phone for troubleshooting.  (Hrg. Tr. 318:10–15.)  On one occasion, D.A.'s special education teacher went to D.A.'s house to fix the school-issued iPad.  (Hrg. Tr. 182:23– 183:4.)  D.A.'s guardians were more comfortable with their home computer than the iPad and would sometimes use that to access lessons, but the home computer did not have a camera.  (Hrg. Tr. 259:5–10, 13.)  In September 2020, the District offered the guardians a laptop that had an integrated camera and was set up to be "super user friendly."  (Hrg. Tr. 318:20–319:3.)  They declined the offer, however, because they did

---

[5]      The Court will refer to this as "virtual" instruction.  Instruction delivered when both the teacher and student are physically present in the school will be called "in-school" instruction, while "in-home" instruction denotes instruction delivered while both the teacher and D.A. were physically present in D.A.'s home.

not want more devices in their home.  (Hrg. Tr. 161:4–15.)  None of the support and accommodations the District offered resolved the issues.

D.A. also exhibited new behavioral problems in the virtual environment that interfered with learning.  D.A. would run or walk away from the screen, scream, or say things like "I don't want to do school."  (Hrg. Tr. 277:7–9; 343:11–13.)  Attempts to redirect D.A. were unsuccessful.  The guardians would sometimes chase D.A. and try to convince the student to re-engage; other times, they would end the session early.  (Hrg. Tr. 354:9–355:5.)  The District PCA, who logged in to all D.A.'s scheduled lessons, tried to get D.A.'s attention by saying the student's name.  (Hrg. Tr. 485:16–20.)  For a while, a PCA provided through a behavioral health agency was present in the home to deliver "wraparound" support[6] for D.A.  (Hrg. Tr. 94:24–95:4.)  The PCA was not trained in the PBSP, defaulted to techniques that conflicted with D.A.'s IEP and did not provide effective learning support.  (Hrg. Tr. 344:6–24.)  All this reinforced for D.A. that challenging work could be avoided by running away or resisting.  (Hrg. Tr. 415:12–19.)

The District believed it could address D.A.'s behavioral problems by adapting to a virtual format the PBSP that had worked in-school, but D.A.'s guardians refused to cooperate—they would not follow instructions for making preferred activities available, and they would interrupt sessions when teachers tried to implement the plan on their own.  (Hrg. Tr. 349:6–350:8.)  Although the wraparound PCA was willing to follow teachers' instructions to carry out the PBSP, the guardians told the PCA not to do so. (Hrg. Tr. 344:25–346:6.)

---

[6]      "Wraparound" support refers to community-based support for families of individuals with disabilities.  In this case, a community-based behavioral aide provided in-home assistance for D.A.

Because of these problems, D.A. received little instruction from March through June of 2020. (SD-16, at 1; SD-36, at 131.) D.A.'s guardians believed the only viable option was to have D.A.'s District PCA, therapists, and teachers provide in-home instruction. (Hrg. Tr. 92:18–23.) The District consistently declined the request due to public health concerns. (Hrg. Tr. 965–66.)

C

The 2020–2021 School Year

D.A.'s IEP team convened virtually in June 2020 to develop an IEP for the 2020–2021 school year. (SD-17, at 7.) Because it was unclear at that time whether schools would re-open in the Fall, the IEP was designed for either virtual or in-school implementation. (Hrg. Tr. 312:9–10.) D.A.'s guardians wanted D.A. to repeat kindergarten and the District agreed. (Hrg. Tr. 147:1–6.)

The District offered only virtual instruction for the first two weeks of the 2020–2021 school year. (Hrg. Tr. 322:15.) Beginning on September 14, 2020, the District invited D.A. and a few other special education students to return to in-school instruction, and D.A.'s IEP was updated to recommend this placement. (Administrative Decision at 7 ¶16; Hrg. Tr. 272:18.) Out of concern for D.A.'s health, D.A.'s great-grandparents insisted on continuing virtual instruction. (Hrg. Tr. 325:1–5.) The District returned to all-virtual instruction from Thanksgiving until the New Year out of concern over heightened COVID levels from holiday travel. (Hrg. Tr. 273:10–20.) On January 25, 2021, the District allowed all students to return for in-school instruction. (Hrg. Tr. 673:24–674:1.) D.A.'s guardians, along with roughly 35% of District families, chose to remain virtual for the Spring semester. (Hrg. Tr. 470:5–471:4, 690:23–25.)

The technological and behavioral problems from the Spring of 2020 persisted throughout the 2020–2021 school year, with a similar effect on D.A.'s attendance and academic progress. D.A.'s IEP team met in September and December of 2020 and January, March and May of 2021. (Administrative Decision at 7 ¶15, 8 ¶20, 9 ¶24, 10 ¶¶27–28.) The Hearing Officer found that the District "continued to recommend a return to school-based programming" at these meetings. (*Id.* at 9 ¶24.)

D

D.A.'s guardians filed their special education due process complaint in December of 2020, alleging that D.A. was denied a FAPE under the IDEA during the 2019–2020 and 2020–2021 school years. (Administrative Decision at 2.) Following a hearing held over the course of several days in the Summer of 2021, the Hearing Officer found in favor of the District.

II

A district court applies a "modified *de novo*" standard when reviewing an administrative hearing officer's decision under the IDEA. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). Conclusions of law receive plenary review. *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 528 n.3 (3d Cir. 1995). The hearing officer's factual findings are considered *prima facie* correct, and if the Court departs from those findings, it must explain why. *D.S.*, 602 F.3d at 564. The Court must accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (emphasis omitted) (internal quotation omitted). "The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *Ridley Sch. Dist. v. M.R.*,

7

680 F.3d 260, 268 (3d Cir. 2012) (quotation omitted).  The party challenging the hearing officer's decision—here, the great-grandparents—bears the burden of persuasion.  *Id.* at 270.

A

The IDEA requires states receiving federal education funding to provide a FAPE to all children with disabilities.  20 U.S.C. § 1412(a)(1).  "A FAPE . . . includes both 'special education'"—instruction specially designed to meet the child's unique needs— and "related services"—"the support services required to assist a child to benefit from that instruction."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citations omitted) (cleaned up).  To meet its FAPE obligation, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Id.* at 399.  Whether the District met its FAPE obligation is a question of fact.  *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).  If a school district knows or should know that a child is not receiving a FAPE, it "must correct the situation.  If it fails to do so, a disabled child is entitled to compensatory education"—education past the child's twenty-first birthday—"for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem."  *M.C. on behalf of J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996).

B

The Hearing Officer concluded that "[u]nder the circumstances, and that period taken as a whole as reflected in this record, the District provided FAPE to the student in the period from March–June 2020."  (Administrative Decision at 15.)  The Court

8

agrees that the virtual instruction plan was reasonably calculated to allow D.A. to receive a meaningful educational benefit when it was developed.  To the extent that it became apparent over the course of that period that D.A. would not be able to benefit from virtual instruction, D.A. is not entitled to compensatory education, *see* Part II.B.3, *infra*.

1

The Hearing Officer found it difficult to assess what the District's FAPE obligation was during the March to June, 2020 timeframe, (Administrative Decision at 14), and understandably so—a typical FAPE analysis does not map easily onto the unique circumstances presented by a global pandemic.[7]  In normal times, the District's professional educators implement the IEP, with regular audits by a board-certified behavior analyst to ensure fidelity to the program and to give teachers feedback on how best to implement it.  (Hrg. Tr. 213:1–7.)  In a virtual environment, the District had to rely on families to assist with implementing the tangible and environmental aspects of students' IEPs.  This co-mingling of school and family responsibility muddies the waters between the typical IDEA case, where the school fully controls IEP implementation, and cases in which parents prevented IEP implementation by not bringing the child to school for instruction.  *Compare Damian J. v. Sch. Dist. of Phila.*,

---

[7]     Plaintiffs argue that the Court is bound by guidance from the Pennsylvania Department of Education on in-home services for students with disabilities. Pa. Dept. of Educ., *Answers to FAQs: Additional Information Regarding the COVID-19 Pandemic from BSE*, https://www.education.pa.gov/k-12/special%20education/FAQcontact/pages/addinfocovid19.aspx (Aug. 31, 2020).  Guidance from state educational agencies "do[es] not, however, establish law." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 591 (3d Cir. 2000); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012).  To the extent such guidance could control, it would not matter.  The guidance, issued in August of 2020, states that if a student's IEP includes a PCA and the school uses a virtual model, the PCA should provide in-home services.  The Court's holding that D.A. was denied a FAPE during the periods of the 2020–2021 school year when the District did not offer in-person education aligns with the guidance.

No. 06-3866, 2008 WL 191176, at *4–5 (E.D. Pa. Jan. 22, 2008) (compensatory education awarded for days when school employed emotional support classroom lead teacher who was neither qualified to teach nor trained to implement IEP), *with Neena S. ex rel. Robert S. v. Sch. Dist. of Phila.*, No. 05-5404, 2008 WL 5273546, at *10 (E.D. Pa. Dec. 19, 2008) (compensatory education not awarded for days student was absent).

Fundamental IDEA principles nonetheless guide the Court's analysis, and the issue is whether the District offered "an educational program reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 580 U.S. at 404. This standard is neither a hollow mandate nor "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* A court "may not rely on hindsight to second-guess an educational program that was reasonable at the time," so the analysis must turn on the information available to the District in the Spring of 2020. *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018); *see also Endrew F.*, 580 U.S. at 399. The focus must remain on whether the program the District offered was appropriate, not whether the family's proposed alternative was better. *See Endrew F.*, 580 U.S. at 399 ("[T]he question is whether the IEP is *reasonable*, not whether the court regards it as ideal." (emphasis in original)); *Ridley*, 680 F.3d at 278–79 (schools have discretion to select from various methods of meeting students' needs and have flexibility to balance disabled students' needs with financial and administrative concerns).

The proper inquiry under the unique circumstances of this case remains whether (1) the instructional plan was reasonably calculated to allow D.A. to make appropriate

progress, and (2) the District could reasonably expect the family to be able to implement the IEP in light of the resources and coaching available to them, allowing for a reasonable adjustment period.

2

The record shows that the District's plan to educate D.A. in a virtual environment was reasonably calculated to allow D.A. to make meaningful progress in light of the child's circumstances.  It was also reasonable, in March of 2020, for the District to expect the child's guardians to be able to implement the IEP in light of the substantial resources and assistance the District provided.

D.A. used an iPad at school, and a reasonable educator would not anticipate the student would be unable to learn virtually.  (Hrg. Tr. 727:2, 16.)  The District expected all students would need time to adjust to the new instructional format, and it formulated an intentional, research-based plan to scaffold—or build up to—the transition.  *See* (Hrg. Tr. 309:8–16, 1000–02).  D.A.'s plan was individualized—it incorporated the child's preferred activities and the length of the pairing phase was tailored to D.A.'s demonstrated progress.  (SD-16, at 1.)  It was reasonable to expect that, with the scaffolding provided, D.A. could learn from virtual instruction.

The District also appropriately anticipated that there might be a learning curve for D.A.'s great-grandparents—and all families—using new technology.  (Hrg. Tr. 309:15–16.)  It provided resources to help families learn the new platforms from the outset, as well as access to tech support.  D.A.'s teachers called the child's guardians before class sessions to assist them in logging on, and D.A.'s case manager even made a home visit to troubleshoot D.A.'s iPad.  (Hrg. Tr. 182:22–24; 318–19.)  It was reasonable

to expect the guardians to be able to log in to D.A.'s sessions within a couple of weeks, given the tutorials and tech support the District made available.

Prior to March of 2020, D.A. did not physically resist instruction, only needed verbal reminders to remain on-task, and responded well to a token economy system. (Hrg. Tr. 300–01.)  It was reasonable for the District to expect the great-grandparents to be able to assist with implementing D.A.'s behavioral supports—the District gave plenty of guidance on how to implement them, and did not require the guardians to do anything outside their skill set.  During virtual instruction, all kindergarten families in the District had to take on a "learning coach" role and assist their students in accessing and engaging with the lessons.  (P-3, at 13.)  D.A.'s teachers offered to coach the student's guardians on implementing D.A.'s PBSP.  (Hrg. Tr. 349:6–350:8.)  For instance, they told D.A.'s great-grandparents when the learning environment needed to be clear of distractions so D.A. could focus, and when preferred toys should be made available to support D.A.'s motivation.  (Hrg. Tr. 341:13–18.)  It was reasonable to expect D.A.'s family to be able to act on these instructions because they were straightforward and did not require special equipment or skills.  It was also reasonable to expect family members who followed these instructions to be as effective in orienting the child to instruction as D.A.'s PCAs had been in-school.  Indeed, the record shows that on an occasion when D.A.'s great-grandparents followed instructions, the child was able to engage with the lessons.  (Hrg. Tr. 1136:20–23.)

3

Once it became obvious that D.A.'s guardians would not implement the virtual instruction plan, it was no longer a FAPE.  But compensatory education is not awarded

for the period reasonably necessary to rectify the IEP deficiency. *M.C.*, 81 F.3d at 397. The period of virtual synchronous instruction during the Spring of 2020 lasted only six weeks. It was not immediately apparent that the virtual instruction plan would not work for D.A. The problems during the initial weeks were not a red flag because all students and families needed time to adjust to new routines. (Hrg. Tr. 259:1–5.) When D.A.'s guardians continued to struggle with the technological aspects of the plan, the District provided targeted interventions. It offered extensive technical support and even the use of alternative devices, with which D.A.'s great-grandparents were more familiar. (Hrg. Tr. 259:23–260:4, 318:16–319:1.) Teachers made themselves available outside of lessons to provide extra coaching on how to implement the behavior plan. (Hrg. Tr. 349:20–24.) At some point, an in-home community behavioral health PCA was added to the mix to provide behavioral support during lessons.[8] (Hrg. Tr. 94:25–95:2; 344–45.) It was reasonable for the District to take a few weeks to try targeted interventions before risking the health of its employees and D.A.'s family by switching to in-home instruction. *See Ridley*, 680 F.3d at 278–79. By the time it became clear that virtual instruction could not be successfully implemented for D.A., the school year was ending, and any change in course would have to wait until the next academic session.[9]

---

[8]     Although the District did not provide the behavioral health PCA, it was reasonable for the District to wait and see if this change in D.A.'s at-home coaching team would help the student access instruction.

[9]     Plaintiffs originally challenged the District's failure to provide extended school year ("ESY") services. But the Hearing Officer found that they had not carried their burden on showing a denial of ESY services because there was not enough evidence on the record to determine whether ESY wasn't offered, or whether D.A.'s great-grandparents rejected it. (Administrative Decision at 7, 15.) Plaintiffs do not challenge this finding.

C

The Hearing Officer found as a matter of fact that "the District's consistent offer of school-based programming" during the 2020–2021 school year was a FAPE. (Administrative Decision at 16.)  The Court agrees that the District offered a FAPE when it was prepared to provide in-school instruction to D.A.  D.A.'s guardians point out, however, that the Hearing Officer failed to address two short periods that year when the District provided only virtual instruction, which did not constitute a FAPE. The evidence in the record supports the guardians' argument—multiple witnesses testified, without contradiction, that in-school instruction was not offered during the first two weeks of the 2020–2021 school year, (Hrg. Tr. 322:8–24, 673:7–19, 1007:4–10, 1079:16–18), and from November 17, 2020 into the New Year.  (Hrg. Tr. 273:12–20, 673:20–24, 848:7–8, 1080:1–5.)

1

In-school instruction was a FAPE for D.A. during the 2020–2021 school year. The student's difficulty with virtual instruction was largely attributable to the difference between the environmental and behavioral supports available at home and at school.  (Hrg. Tr. 852:1–7.)  Specifically, D.A. was able to make meaningful progress at school because the teachers consistently implemented the behavioral support plan and limited distractions.

D.A.'s guardians did not allow D.A. to go to school because they believed that D.A. was particularly susceptible to COVID.  (Hrg. Tr. 91:8–14.)  They were also concerned that masking would be ineffective because D.A.'s low muscle tone caused drooling that quickly soaked through masks.  (Hrg. Tr. 1047:12–16.)  At the hearing,

14

they proffered a letter from D.A.'s doctor stating that "[D.A.] and especially [the student's] grandparents are at high risk due to COVID 19.  They have therefore opted for in home schooling." (SD-19, at 1.)  But the doctor does not recommend against in-school learning; it frames the decision to keep D.A. home as one made by the great-grandparents.  Nor does the doctor opine on the risk of the District's proposed setup for the Fall of 2020, which invited only a few students to return to the building and implemented intensive protocols to prevent COVID transmission.  (Hrg. Tr. 1008–11.)  Indeed, as the Hearing Officer found, the guardians' request for all of D.A.'s teachers and support staff to come to their house presented the same or greater risk of transmission given the smaller space and direct contact between school personnel, D.A. and the great-grandparents.  (Administrative Decision at 18; Hrg. Tr. 92:18–23.)  While their health concerns were understandable, the District's proposed in-school placement appropriately accounted for both COVID safety and D.A.'s educational needs.

### 2

A District satisfies its FAPE obligation by offering an appropriate IEP, even if the parents decline to have the student participate in the program.  *See S. v. Wissahickon Sch. Dist.*, No. 05-1284, 2008 WL 2876567, at *10 (E.D. Pa. July 24, 2008) (IEP District offered was a FAPE, even though plaintiffs refused to engage in programming designed by District).  As discussed in Part II.C.1., *supra*, D.A. required in-school instruction because the great-grandparents refused to implement the behavior plan at home and prevented others from implementing it in their presence.  (Hrg. Tr. 905–08; SD-31, at 3.)  The District fulfilled its FAPE obligation for the periods when it

offered D.A. in-school instruction even though the child's guardians demanded virtual instruction.

3

The District did not, however, provide a FAPE in the first two weeks of the 2020–2021 school year, when it only offered virtual instruction. As discussed in Part II.B.3., *supra*, the District should have been aware by the end of the 2019–2020 academic year that virtual instruction would not produce a meaningful educational benefit for D.A. While the District quite understandably prioritized the health of its employees and students during this period, *see* (Hrg. Tr. 967:20–968:5), the IDEA is concerned with access to educational opportunities. *See M.C.*, 81 F.3d at 397; *Downingtown Area Sch. Dist. v. G.W.*, No. 19-5424, 2020 WL 5981902, at *8 (E.D. Pa. Oct. 8, 2020) ("The delays may have been out of the District's control, but those difficulties cannot diminish [student]'s right to a FAPE." (citation and internal quotations omitted)). Because D.A. was deprived of a FAPE while nondisabled peers received virtual instruction, the student is entitled to relief regardless of whether the deprivation was caused by the District's inaction or a pandemic. *See Aja N. v. Upper Merion Area Sch. Dist.*, No. 21-4234, 2022 WL 3371612, at *5 (E.D. Pa. Aug. 16, 2022) (no emergency exception to the FAPE requirement).

The IDEA permits a court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Courts in this Circuit frequently award compensatory education to students denied a FAPE. *See Tyler W. ex rel. Daniel W. v. Upper Perkiomen Sch. Dist.*, 963 F.Supp.2d 427, 438 (E.D. Pa. 2013). "The amount of compensatory education is calculated by finding the period of deprivation of special

16

education services and excluding the time reasonably required for the school district to rectify the problem." *Id.* at 439 (internal citation and quotations omitted). "A disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education." *P.P.*, 585 F.3d at 739 (3d Cir. 2009) (internal citation and quotations omitted). Again, the District knew by the end of the 2019–2020 school year that virtual instruction was not a FAPE for D.A., so the "period of deprivation" began on the first day of the 2020–2021 school year and continued for two weeks until the District offered an in-school option. The District had the entire summer to determine how to provide a FAPE to D.A., so it is not entitled to any reduction in the two-week compensatory education period.

Similarly, D.A. was also not offered a FAPE when in-school education was suspended from November 17, 2020 until after the holiday season. (Hrg. Tr. 273:12–20.) The Court cannot determine from the record when in-school instruction resumed, nor can it tell when the decision was made to pivot to virtual instruction. *See* (Hrg. Tr. 273:10–20 (virtual instruction from November 17th "until the New Year"), 673:20–674:1 ("we did move to all virtual again . . . around Thanksgiving to Christmas. And then all of our students that chose to come back in person came back January 25th for five-day-a-week instruction."), 1080:1–5 (closure lasted from "approximately . . . November 10th" until "around January 11th")).

The Court will consider supplemental briefing and, to the extent necessary, hold an evidentiary hearing to determine the exact number of days in-person education was not provided and the appropriate compensatory education calculation.

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.